**UNITED STATES of America**

v.

**Kristen GILBERT**

**No. 98–CR–30044–MAP.**

United States District Court,
D. Massachusetts.

Nov. 14, 2000.

---

David P. Hoose, Katz, Sasson & Hoose, Springfield, MA, Harry L. Miles, Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, MA, Paul S. Weinberg, Robinson, Donovan, Madden & Barry, Springfield, MA, for Kristen Gilbert.

Michael Labrie, Labrie & Pouliot, Chicopee, MA, David M. Allen, James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL, for Joint Commission on Accreditation of Healthcare Organizations.

Joseph P. Pessolano, Kelly, Pessolano, Dusel & Murphy, Springfield, MA, for Republican Co.

William M. Welch, II, Ariane D. Vuono, United States Attorney's Office, Springfield, MA, for U.S.

### *MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO STRIKE NONSTATUTORY AGGRAVATING FACTORS*

(Docket No. 210)

PONSOR, District Judge.

## I.  *INTRODUCTION*

Defendant Kristen Gilbert has been indicted on four counts of murder, three counts of attempted murder and six counts of assault with intent to murder, all alleged to have been committed upon patients while she was a nurse at the Veterans Affairs Medical Center (VAMC) in Northampton, Massachusetts. The Government has filed a notice of its intent to seek the death penalty if defendant is convicted of any of the four murder counts. *See* Memorandum in Support of Defendant's Motion to Strike, Docket No. 211, Exhibit A (Government's Notice). In its Notice, the United States listed the statutory and nonstatutory aggravating factors that it wishes to present to the jury in support of a death sentence.

Defendant has moved to strike portions of the four nonstatutory aggravating factors the Government proposes to offer to the jury as justification for the death penalty, if the trial reaches that stage. Specifically, she objects to portions of Factor 2, entitled "Other, charged and uncharged, acts of violence and other offenses," which has six sub-paragraphs, and Factor 3, entitled "Future dangerousness of the defendant," which now has seven sub-paragraphs.[1] For the reasons set forth below, the court will allow defendant's motion in part, and strike all the challenged nonstat-

utory aggravating factors except those listed in sub-paragraphs 2c, 2d, and 2f, as to which the motion is denied. Put simply, the stricken factors lack sufficient gravity, reliability, or probative value to deserve consideration during deliberations on the death penalty, if the jury reaches the question.

## II.  *DISCUSSION*

Defendant's motion presents a profound question: what may a jury consider in deciding whether a capital defendant should live or die? Congress has not provided specific guidelines for the admissibility of such evidence. Rather, it has entrusted trial judges both with substantial responsibility and with broad discretion to act as guardians of the sentencing process. The courts must ensure that the evidence presented to the jury in capital sentencing hearings is truly worthy of consideration in a decision as grave as this.

The discussion that follows will first explain the general structure of the sentencing process in a capital case, and the considerations that inform it, then address the proposed nonstatutory aggravating factors challenged by the defendant.

### A.  *The Penalty Phase in General.*

The nonstatutory aggravating factors before the court today contain some of the last pieces of evidence that may appear before the jury in this case. As required by the Supreme Court, the Federal Death Penalty Act bifurcates capital trials into a guilt/innocence phase, which is just like any other murder trial, and a sentencing phase, in which the jury decides whether to impose a death sentence. *See* 18 U.S.C. § 3593(b); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The nonstatutory aggravating factors become relevant in the sentencing phase, which the

---

1. The Government originally included twelve sub-paragraphs under Factor 3, but has since withdrawn five of them: 3a, 3d, 3e, 3g, and 3i. Defendant does not challenge the first nonstatutory aggravating factor, that of en-

gaging in a "Series of Murder Offenses," but she does seek to limit the testimony under Factor 4, "Victim impact evidence," by separate motion not before the court today.

court reaches only if the defendant is found guilty of a capital count.

Within the sentencing phase, Congress has set up a two-part screening procedure that the jury must undertake before it may even consider the imposition of the death penalty on a capital murder defendant. First, the jury must unanimously find beyond a reasonable doubt that the defendant "intentionally killed the victim" or intentionally engaged in specific conduct that resulted in the death of the victim. *See* 18 U.S.C. § 3591(a)(2)(A)-(D). Second, the jury must unanimously find at least one of sixteen statutorily-prescribed aggravating factors to be present. *See* 18 U.S.C. § 3592(c)(1)-(16). These "statutory aggravating factors" were drawn up with some care; they consist only of conduct making the instant offense a great deal more culpable, or prior convictions for other serious crimes. *See id.* Three statutory aggravators are asserted here: the "heinous, cruel, or depraved manner" of the alleged murders, the "substantial planning and premeditation," behind them, and the "vulnerability" of the victims "due to old age … or infirmity." *See* 18 U.S.C. § 3592(c)(6), (9), (11).

If both the intent element and at least one statutory aggravating factor are found by the jury unanimously and beyond a reasonable doubt, then the jury considers the "nonstatutory aggravating factors" offered by the Government. By statute, these factors may consist of victim impact testimony and "any other relevant information." 18 U.S.C. § 3593(a)(2). As with the statutory aggravating factors, the Government must prove the nonstatutory aggravators beyond a reasonable doubt. The jury must balance all the aggravating factors against any mitigating factors offered by the defendant and decide whether to impose the death penalty or life imprisonment without the possibility of parole.

### B. *Standard of Review.*

■ Through interpretation of the Federal Death Penalty Act and the rulings of the U.S. Supreme Court, the federal courts have arrived at a three-part test to guide their discretion in evaluating nonstatutory aggravating factors. *See United States v. Davis,* 912 F.Supp. 938, 943 (E.D.La.1996). First, the information must be "relevant." *Id.* The provision on nonstatutory aggravating factors allows the introduction only of "relevant information" (of which the Government has given notice) that may tend to make the death penalty more appropriate. 18 U.S.C. § 3593(a)(2). Second, the information must meet the "heightened standard of reliability" the Supreme Court has required in death penalty cases. *Ford v. Wainwright,* 477 U.S. 399, 410–11, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *see also Spaziano v. Florida,* 468 U.S. 447, 456, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Finally, even if relevant and reliable, proposed aggravating factors may be excluded if their probative value is outweighed by the danger of unfair prejudice to the defendant, confusion of the issues, or a likelihood that the jury will be misled. *See* 18 U.S.C. § 3593(c).

### 1. *Relevance.*

■ For a nonstatutory aggravating factor to be "relevant" within the meaning of the statute, it must be "sufficiently relevant to the consideration of who should live and who should die." *Davis,* 912 F.Supp. at 943; *see also United States v. Friend,* 92 F.Supp.2d 534, 541 (E.D.Va. 2000); *United States v. Peoples,* 74 F.Supp.2d 930, 932 (W.D.Mo.1999). Congress could not have intended the word "relevant" to mean anything less, given the strong Constitutional policy favoring guided and measurable jury determinations on capital punishment. *See generally Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). As the Supreme Court has held, aggravating factors in death penalty cases must be "*particularly* relevant to the sentencing decision," not merely relevant, in some generalized sense, to whether defen-

dant might be considered a bad person. *Gregg*, 428 U.S. at 192, 96 S.Ct. 2909 (emphasis added).

### 2. *Reliability*.

■ The second factor a court must consider is the reliability of the information. The Supreme Court has emphasized that heightened reliability is crucial in capital sentencing hearings because of the uniquely grave consequences of a death verdict. *See Ford v. Wainwright*, 477 U.S. 399, 410–11, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). Indeed, some information that might be admitted in a normal sentencing hearing will be insufficiently reliable for the jury to use in considering whether a defendant should be put to death. *See Davis*, 912 F.Supp. at 943.

### 3. *Probative Value Versus Prejudice*.

■ Finally, even if the proffered information is relevant and sufficiently reliable, it may still be excluded if its probative value "is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). The balance of probative value and unfair prejudice must be weighed more carefully in a death penalty case than in normal cases. Under the statute, probative value need not be "substantially" outweighed by prejudice, as Fed.R.Evid. 403 generally requires. *See id.*

### C. *The Government's Nonstatutory Aggravating Factors*

### 1. *Factor 2—Other Offenses.*

■ Defendant first attacks the Government's Factor 2, entitled "Other, charged and uncharged, acts of violence and other offenses," which has six sub-paragraphs.

Sub-paragraphs 2a through 2d allege four instances of uncharged violent criminal conduct by the defendant. Sub-paragraph 2e would introduce statistical evidence linking defendant's on-duty presence to patient deaths over the course of six years at the VAMC. In sub-paragraph 2f, the Government seeks to present the defendant's prior conviction for making a bomb threat to the VAMC at the time she was being investigated for patient deaths.

Defendant argues that evidence of uncharged criminal conduct may not be introduced as an aggravating factor, because admission of such evidence would violate fundamental fairness, ignore the heightened reliability requirements of the Eighth Amendment, and disregard Congressional intent. She argues that a jury that has just convicted a defendant of first degree murder could not possibly weigh evidence of other criminal conduct by the defendant impartially at sentencing. A convicted first degree murderer, her argument goes, would automatically be considered capable of committing any crime. According to defendant, the evidence therefore fails to meet the Eighth Amendment's requirement of heightened reliability in capital cases. As for Congressional intent, defendant argues that to allow any uncharged criminal conduct to come in as a nonstatutory aggravating factor would block Congress's goal of guided and measurable determinations in capital sentencing. To achieve this goal, Congress carefully limited the kinds of prior criminal convictions that qualify as *statutory* aggravating factors. It therefore could not have intended to throw the door wide open to other, uncharged crimes for use as nonstatutory aggravators.

These arguments will not wash, for several reasons. First, the overwhelming majority of federal courts has held that neither the Eighth Amendment nor the due process clause impose a *per se* barrier to the use of unadjudicated criminal conduct in capital sentencing. *See, e.g., Hatch v. State*, 58 F.3d 1447, 1465 (10th Cir.1995) (upholding use of prior unadjudicated conduct from due process challenge), *cert. denied*, 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996); *United States v. Coo-*

*per,* 91 F.Supp.2d 90, 106–107 (D.D.C.2000) *and cases cited* (allowing evidence of uncharged racketeering offenses, robbery, shootings and handgun offenses); *United States v. Davis,* 912 F.Supp. at 949 (allowing prior misconduct as long as its use does not violate other safeguards). Indeed, in a pre-*Furman* case, the Supreme Court held that a judge's consideration of unadjudicated crimes in sentencing a defendant to death did not violate the due process clause. *See Williams . v. New York,* 337 U.S. 241, 244, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), *discussed in Hatch,* 58 F.3d at 1465. Although the landscape of federal death penalty jurisprudence has changed substantially since 1949, nothing in the Court's subsequent jurisprudence has disturbed the core ruling in this case. *See Nichols v. United States,* 511 U.S. 738, 747, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (citing holding of *Williams* with approval).

Second, even if this court were not bound by precedent, defendant's arguments against admission are outweighed by the simple fact that evidence of other acts of violence by a defendant "is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty." *Davis,* 912 F.Supp. at 948. For the court to impose a *per se* ban on such evidence would give juries a far more positive view of many capital defendants than is true and accurate. This would detract from the reliability of capital sentencing, because the more information juries have about offenders, the more reliable and predictable their determinations will be.[2] *See United States v. Beckford,* 964 F.Supp. 993, 997–98 (E.D.Va.1997).

Defendant's argument regarding Congressional intent also fails. Congress did not intend, in delineating statutory aggravating factors, to forbid the introduction of other crimes as nonstatutory aggravating factors. As Judge Berrigan explained in *Davis,* requiring a finding of at least one specific statutory aggravating factor serves a gate-keeping function, limiting the type of murderers who will be exposed to the death penalty in the first place. *See Davis,* 912 F.Supp. at 948, n. 25. Congress could rationally conclude that once the Government has passed this statutory threshold, other relevant and reliably-proven criminal acts, even if uncharged, might also be offered as aggravating factors supporting a death sentence. *See id.; see also Zant . v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (holding that while statutory aggravators have an essential role in circumscribing the class of defendants eligible for the death penalty, the Constitution does not require the jury to ignore other possible aggravating factors).

However, a recognition that evidence of uncharged criminal conduct *may* be offered does not mean that *any* criminal act may be considered by the jury as an aggravating factor. As noted above, such crimes must be relevant to the decision of who should live and who should die. On the question of what crimes are so relevant, the court is guided by the statutory aggravating factors Congress has listed in 18 U.S.C. § 3592, which provide "a ready framework for determining Congressional intent" on this matter. *Davis,* 912 F.Supp. at 944. The statutory aggravating factors list only very serious or repetitive felony offenses, such as child molestation, previous conviction of a capital crime, or prior conviction of a felony involving a firearm. *See* 18 U.S.C. § 3592(c). From

---

**2.** The Government will have to prove the commission of such crimes beyond a reasonable doubt. *See United States v. Cooper,* 91 F.Supp.2d 90, 108 (D.D.C.2000) (holding that if Government intends to use prior criminal behavior as aggravating factor *per se,* rather than as evidence of future dangerousness, it must prove such behavior beyond reasonable

doubt); *Beckford,* 964 F.Supp. at 1008 (rejecting request to impose clear and convincing evidence standard for misconduct alleged in support of future dangerousness, but imposing beyond a reasonable doubt standard for proving criminal acts as freestanding aggravating factors).

these factors, it is clear that to be a relevant aggravating factor in favor of the death penalty, prior misconduct must at least be a crime, and a grave one at that. *See United States v. Friend*, 92 F.Supp.2d 534, 544 (E.D.Va.2000). Consideration of relatively minor misbehavior, however disturbing, would undermine the seriousness of the death penalty decision. Rather than helping the jury's decision, the previous misconduct would be a "pernicious distraction[ ] . . . in considering whether a defendant shall live or die." *United States v. Peoples*, 74 F.Supp.2d 930, 932 (W.D.Mo. 1999).

█ Viewed in light of these considerations, the uncharged misconduct described in sub-paragraph 2a fails to qualify for consideration as a nonstatutory aggravating factor. Sub-paragraph 2a alleges that in 1987, eight years before the crimes are alleged to have been committed in this case, Gilbert scalded a young, mentally retarded boy with hot bath water while she was caring for him as a nurse. While of course disturbing, this allegation is simply of insufficient gravity to be relevant to whether the defendant here should live or die, for several reasons. First, there is no evidence that the alleged scalding resulted in severe injury to the boy. Second, any testimony about the incident thirteen years after the fact is not reliable enough to be used at a capital sentencing hearing. Third, no formal charges were ever brought in the matter, and there were no witnesses to the event; rather, symptoms exhibited by the boy later caused his parents to believe that an intentional scalding had taken place. In short, the incident lacks both the necessary weight and high degree of reliability to justify its consideration by the jury as part of the death penalty calculus.

Sub-paragraph 2b also fails for insufficient reliability. This sub-paragraph alleges that in 1988, defendant assaulted her husband, Glenn Gilbert, with a large kitchen knife. The Government has set forth very little information about this incident.

Apparently, the first time it came to anyone's attention was during Glenn Gilbert's testimony before the Grand Jury in this case, ten years after the fact, following a bitter divorce between defendant and her husband. No injury seems to have occurred. Again, the gravity and reliability of this evidence is plainly insufficient.

The Government's sub-paragraph 2c, however, does state an aggravating factor that on its face is appropriate for the jury's consideration if the trial reaches the penalty stage. This sub-paragraph alleges that defendant tried to murder her husband, Glenn Gilbert, by lethal injection in 1995, around the time the charged murders here were alleged to have been committed. Obviously, an attempted murder is a serious crime, comparable to those listed as statutory aggravating factors in 18 U.S.C. § 3592(c). The court cannot say at this point that this evidence is irrelevant to the decision of whether the defendant should live or die. As to the reliability of this allegation, however, the court is unprepared at this time to render a ruling. Unlike the information in sub-paragraph 2b, the incident was reported within a relatively reasonable time from when it supposedly occurred. If the trial reaches the penalty stage, the court will consider a *voir dire* of the witness, at which the reliability of his testimony can be assessed. *See Davis*, 912 F.Supp. at 949 (ordering pretrial hearing on admissibility of proposed aggravating factors).

Sub-paragraph 2d, the assault and attempted murder by poison of Michele Cascone, may also deserve consideration by the jury in making the sentencing decision. In this episode, the Government alleges that Michele Cascone, a patient at the VAMC, died after four cardiac arrests while defendant was on duty. One of the Government's witnesses, a respiratory therapist, will testify that after she responded to one of the "codes" brought on by Cascone's cardiac emergencies, Gilbert pulled out a small glass vial from her pocket and asked her if she wanted some

"epi." The size of the vial was consistent with an ampule of 1:1000 epinephrine. From this evidence, the Government wishes to argue that defendant used the epinephrine in her pocket to poison Cascone. Certainly, the gravity and relevance of this conduct, if proved, would make it proper for consideration by the jury at the penalty stage. As with the testimony of Glenn Gilbert, the motion to strike will therefore be denied; the court will consider a possible *voir dire*, if there is a penalty stage, to assess the information's reliability.

Similarly, the Government may introduce the evidence summarized in sub-paragraph 2f, the conviction for making a bomb threat to the VAMC. The applicable federal statute specifies a maximum sentence of ten years for this offense. *See* 18 U.S.C. § 844(e). Moreover, the threat required evacuation of the patients at the VAMC's Ward C and Ward C annex to another building several hundred yards away. *See United States v. Gilbert*, 181 F.3d 152, 155 (1st Cir.1999). This hasty relocation put a number of patients at grave risk, as the defendant surely knew. The bomb threat has already been proven beyond a reasonable doubt, satisfying the reliability requirement. Its presentation should be fairly straightforward, and its probative value as to defendant's character is not outweighed by unfair prejudice. Defendant's motion to strike sub-paragraph 2f will therefore be denied.

In sub-paragraph 2e, the Government seeks to introduce "statistical evidence of the extremely high association of patient deaths and the defendant's presence on duty" during her tenure at the VAMC. This testimony was excluded from the Government's case-in-chief because of its unreliability and its potential for unfair prejudice. The matter needs no further discussion in this context, except to note that the concerns that drove the court's prior ruling are even more pertinent here, given the enhanced reliability required in a capital sentencing hearing and the lower threshold at which prejudice outweighs probative value. *See* 18 U.S.C. § 3593.

2. *Factor 3—Future Dangerousness.*

■ Defendant next challenges various sub-paragraphs of Factor 3 in the Government's notice, regarding the "future dangerousness of the defendant." The prosecution concedes that the jury must evaluate defendant's "future dangerousness" in the context of life in a prison setting, because if defendant is convicted, the only punishment that may be imposed other than the death penalty is life imprisonment without the possibility of parole. *See, e.g., United States v. Cooper*, 91 F.Supp.2d 90, 111–12 (D.D.C.2000); *Peoples*, 74 F.Supp.2d at 932; *United States v. Nguyen*, 928 F.Supp. 1525, 1542, n. 14 (D.Kan.1996). Defendant argues that none of the information summarized as part of Factor 3 has any relevance to her future dangerousness in a prison setting. Counsel point out that many of the sub-paragraphs do not describe violent tendencies at all. For example, sub-paragraphs 3b, 3c, and 3h allege that defendant tried to obtain medications or syringes through theft or false pretenses, and 3f states that she abused her position as a nurse. Sub-paragraph 3l alleges that defendant has feigned being overmedicated.

The Government in oral argument contended that these factors show that even in prison defendant will continue to be dangerous, because she is a "poisoner," and will use guile and cunning to obtain medications to poison staff or other inmates. The court cannot agree. The proposed information lacks any substantial relevance to defendant's dangerousness in a prison setting. It is simply inconceivable that, if defendant is convicted of first degree murder in this case, she will ever have the remotest opportunity to obtain poison or medication again. Any maximum security prison to which she is likely to be sentenced for the remainder of her life will be fully aware of the circumstances of her

crime and alert to prevent any access by defendant to poisons. The threat of defendant poisoning anyone in prison is simply illusory. The evidence summarized in sub-paragraphs 3b, 3c, 3f, 3h and 3l is irrelevant to the question of future dangerousness.

Two other sub-paragraphs offer further evidence under the heading of "future dangerousness." The first of them, sub-paragraph 3j, describes an attempted breaking and entering into the home of defendant's extramarital lover, James Perrault. This, again, is of insufficient relevance to the jury's decision on the death penalty. The Government has failed to explain why this incident has any bearing on defendant's dangerousness in prison, where she would be under lock and key. Nor is it a prior criminal act of sufficient gravity that it would be relevant as a freestanding non-statutory aggravating factor.

Finally, sub-paragraph 3k describes a 1996 incident in which defendant allegedly threatened to stab Glenn Gilbert and tore a telephone off the wall at his residence in Florence, Mass. The incident was reported during the bitter divorce noted above. Even if the incident happened in the way described, it essentially amounts to a confused and angry outburst during a heated domestic dispute, conduct of insufficient weight to count towards the death penalty. As the court stated in *Davis*,

> Threatening words and warped bravado, without affirmative acts, are simply too slippery to weigh as indicators of character; too attenuated to be relevant in deciding life or death; and whatever probative value they might have is far outweighed by the danger of unfair prejudice and confusion of the issues.

*Davis*, 912 F.Supp. at 945. Although tearing the telephone off the wall is admittedly an "affirmative act" accompanying the alleged verbal threat, the incident as a whole simply lacks sufficient gravity to be included among the factors that could lead to the defendant's execution.

### III.  *CONCLUSION*

For the foregoing reasons, defendant's motion to strike the Government's nonstatutory aggravating factors is hereby ALLOWED as to sub-paragraphs 2a, 2b, and 2e. Factor 3 is stricken in its entirety, defendant's motion having been ALLOWED as to all sub-paragraphs not waived by the Government. As to sub-paragraphs 2c, 2d and 2f, the motion is DENIED.

It is So Ordered.